IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TINA PETROWSKY,                        )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )  Civ. No. 10-563-SLR
                                       )
MICHAEL ASTRUE, Commissioner of        )
Social Security,                       )
                                       )
            Defendant.                 )
_____

Gary Linarducci, Esquire and Steven L. Butler of New Castle, Delaware. Counsel for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, District of Delaware, Patricia A. Stewart, Esquire, Special Assistant United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware. Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Eda Giusti, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.
_____



**MEMORANDUM OPINION**







Dated: December 6, 2011
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Tina Petrowsky ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to find her disabled or remand the case for further proceedings. (D.I. 7) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 10) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed for DIB on December 5, 2005, claiming she had been disabled since May 14, 2004 due to cervical spine and back injuries, temperomandibular joint syndrome ("TMJ"), attention deficit disorder, bipolar disorder, liver enlargement, osteoporosis, sciatica, pinched nerve, type II diabetes, high blood pressure and congestive heart failure. (D.I. 5 at 136; 153) All parties agree that plaintiff's date last insured ("DLI") was December 31, 2005, making the relevant period at issue May 14,

---

[1] Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

2004 until December 31, 2005. (D.I. 8 at 1; D.I. 11 at 1)

Plaintiff's DIB claim was initially denied on May 26, 2006. (D.I. 5 at 103) It was denied on reconsideration on August 16, 2006. (Id. at 112) On January 3, 2008, a hearing on plaintiff's DIB claim was held in front of Administrative Law Judge ("ALJ") Judith A. Showalter. (Id. at 27) At the hearing, the ALJ heard testimony from plaintiff, plaintiff's treating psychiatrist, Dr. Jay G. Weisberg, and vocational expert ("VE") Mitchell Smith. (Id. at 28) In a decision issued July 18, 2008, the ALJ found that plaintiff was not disabled because, while she could not perform her past work, she could perform other work available in the national economy. (Id. at 28) The Appeals Council denied plaintiff's request for review and, therefore, the ALJ's decision became defendant's final decision. (Id. at 1) Having exhausted her administrative remedies, plaintiff filed a civil action in this court on January 26, 2010, seeking review of defendant's decision to deny her DIB.

## B. Plaintiff's Non-Medical History

Plaintiff was born on February 6, 1961. (Id. at 136) She is a high school graduate and has been previously employed as a secretary, customer service representative and cashier. (Id. at 154)

## C. Plaintiff's Medical History[2]

### 1. Mental

Plaintiff has a history of bipolar disorder and has treated with Dr. Jay G.

---

[2] Because plaintiff's appeal primarily concerns her bipolar disorder, cervical and lumbar spinal issues and carpal tunnel syndrome, the background section of this opinion will focus on these conditions.

2

Weisberg since 1993. (*Id.* at 1311-53; 543-62) Dr. Weisberg regularly saw plaintiff for twenty minute medication check / counseling sessions. (*Id.* at 83) Dr. Weisberg's treatment records indicate that he routinely prescribed plaintiff medications in an attempt to control her bipolar-related symptoms. (*Id.* at 1311-53; 543-62) His records also reflect Global Assessment Functioning ("GAF")[3] scores in the 51-55 range during the relevant period. (*Id.* at 544-59)

Plaintiff's medical records indicate that she was hospitalized on two occasions during 2001 for psychiatric reasons. The first hospitalization occurred on March 4, 2001; plaintiff was admitted to the Rockford Center for a two-day stay because she was suicidal. (*Id.* at 425-29) The second occurred on September 3, 2001; plaintiff was admitted to Meadowwood Behavioral Health for a five-day stay because she was again suicidal and was also exhibiting signs of disorganized behavior. (*Id.* at 431-33)

Two mental health professionals have filled out a total of three questionnaires relating to plaintiff's ability to work in light of her mental health concerns. Dr. Weisberg completed two Mental Impairment Questionnaires; the first was completed on July 14, 2006 and the second on August 21, 2007. (*Id.* at 1107-11; 1173-78) These questionnaires indicate that plaintiff would have serious difficulty functioning in a work

_____

[3] The GAF test "measures an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness on a scale of one to a hundred." *Colon v. Barnhart*, 424 F. Supp. 2d 805, 808-09 (E.D. Pa. 2006). "[A] GAF [score] of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). . . . A GAF [score] of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008) (internal quotations and citations omitted).

3

environment. (*Id.*) In the 2006 assessment, Dr. Weisberg opined that plaintiff was unable to do things like: 1) remember work-like procedures; 2) carry out short and simple instructions; 3) sustain an ordinary routine or complete a normal workweek without interruptions from psychological symptoms; 4) handle normal work stress; or 5) work with others. (*Id.* at 1109) He also stated that plaintiff's mental impairments would cause her to miss at least four days of work per month. (*Id.* at 1108) Dr. Weisberg's 2007 assessment was mostly consistent with his 2006 findings. (*Id.* at 1175) At the agency's request, Dr. Richard G. Irvins performed a psychological evaluation of plaintiff. After this March 12, 2008 examination, Dr. Irvins prepared a report on plaintiff and also filled out a Medical Source Statement of [Plaintiff's] Ability to Do Work-Related Activities. (*Id.* at 1302-06) In this Source Statement, Dr. Irvins indicated that plaintiff would have moderate and marked difficulties doing work-related mental activities. (*Id.* at 1305-06) More specifically, he found that plaintiff could satisfactorily 1) carry out simple instructions and 2) interact with the public and supervisors, but he opined that plaintiff would have marked difficulties: 1) understanding, remembering and carrying out complex instructions; 2) making simple work related judgment calls; and 3) interacting appropriately with coworkers. (*Id.*)

## 2. Physical

After a 1999 motor vehicle accident, plaintiff initially treated with her primary care physician, Dr. David Estock. (*Id.* at 1431; 1009) In response to her complaints of neck, shoulder, back and upper and lower extremity pain, Dr. Estock prescribed pain medications, physical therapy and chiropractic care; he also referred plaintiff to Mid

4

Atlantic Spine and Pain ("Mid Atlantic"). (*Id.*) At Mid Atlantic, plaintiff was treated for her pain and spine issues by several doctors, including Dr. Frank J. E. Falco. (*Id.*) In letters dated November 16, 2003 and April 29, 2005, Dr. Falco outlined, in detail, plaintiff's course of treatment after the accident. (*Id.* at 1009-12; 1431-35) Dr. Falco notes that plaintiff was originally diagnosed with myofasical injuries to the neck and low back. (*Id.*) Between 1999 and 2004, plaintiff continued to receive chiropractic care and she also continued treating with and receiving pain medications from doctors at Mid Atlantic. (*Id.*) Plaintiff had facet joint nerve block injections in March and November of 2000 and June and July of 2004. (*Id.*) Plaintiff also had a cervical facet denervation procedure in June of 2000 and facet joint nerve ablations in December of 2000 and August and September of 2004. (*Id.*)

In 2005, plaintiff made several trips to the emergency room. In August of 2005, plaintiff presented at the Christiana Hospital emergency room after being involved in a motor vehicle accident; she left without receiving treatment. (*Id.* at 506-08) In September 2005, plaintiff again presented to the Christiana Hospital emergency room complaining of severe back pain forty-eight hours after attempting intercourse. (*Id.* at 511) An MRI was performed and revealed the following: (1) "large central disc herniation L5-S1 with severe central stenosis and compression of both S1 nerve roots;" (2) "disc herniation at L4-L5 with moderate to severe central stenosis and severe right foraminal stenosis with compression of the right L4 nerve root;" (3) "moderate central stenosis due to spondylosis and disc bulging at L3-L4;" and (4) "mild central stenosis at L2-L3." (*Id.* at 526). After examination and review of the MRI, Dr. Pawan Rastogi

diagnosed plaintiff with moderate disk herniation and mild stenosis; Dr. Rastogi recommended "managing her [pain] conservatively with epidural injections." (*Id.* at 516) In November of 2005, plaintiff returned to the Christiana Hospital, this time via ambulance. Plaintiff called an ambulance because she awoke with severe back pain and was unable to stand. (*Id.* at 531) Plaintiff was diagnosed with sciatica and discharged. (*Id.* at 532)

Dr. Rastogi performed L5-S1 hemilaminotomy and microdiskectomy surgery on plaintiff on May 8, 2006. (*Id.* at 1046) The surgery was performed to alleviate plaintiff's back pain, specifically with respect to her herniated disks. (*Id.*) Despite Dr. Rastogi suggesting that plaintiff manage her pain conservatively, plaintiff opted to go through with the surgery. (*Id.* at 1015; 1020)

Aside from her cervical and lumbar spinal issues, it should also be noted that plaintiff was diagnosed with carpal tunnel syndrome in January of 2005. (*Id.* at 982) Plaintiff is considered morbidly obese. (*Id.* at 15)

Several doctors have provided their professional opinion on the extent to which plaintiff is capable of working in spite of her physical limitations. In his November 16, 2003 and April 29, 2005 letters previously mentioned,[4] Dr. Falco opined on plaintiff's limitations. In his 2003 letter, Dr. Falco stated that plaintiff "is capable of sedentary light duty work only as a result of the injuries to her neck and lumbar spine;" he went on to say that: "restrictions would include lifting no more than ten pounds. She should avoid repetitive bending, lifting or twisting. . . . She should avoid prolonged sitting or

---

[4] These letters were addressed to plaintiff's attorneys.

6

standing." (*Id.* at 1012) In 2005, Dr. Falco stated: "It is my medical opinion that [plaintiff] sustained permanent injuries to her neck and back as a result of the 3-24-99 motor vehicle accident as well as traumatic carpal tunnel syndrome. . . . [P]lainitff is capable of sedentary work activity on a part time basis (4 hours per day only). The following restrictions are permanent at this point: she should not lift more than 5 pounds; no repetitive bending, stooping, crawling or kneeling; no prolonged sitting or standing." (*Id.* at 1435)

In May of 2006, state agency physician Dr. Richard Carter completed a Physical Residual Functional Capacity Assessment. Based upon his review of her records, Dr. Carter found that plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight hour day, push or pull without limitation and only occasionally climb, balance, stoop, crouch, kneel or crawl. (*Id.* at 1065-66) In August of 2007, Dr. Rastogi and Dr. C. Obi Onyewu[5] completed Physical Residual Functional Capacity Evaluations. Dr. Rastogi concluded that plaintiff would not be capable of performing sedentary work on a regular basis due to severe cervical and lumbar spine pain and Dr. Onyewu came to the same conclusion. (*Id.* at 1138-39; 1199)

In March of 2008, at the request of the ALJ, plaintiff was examined by Dr. Yong Kim. In his Medical Source Statement of Ability to do Work-Related Activities, Dr. Kim found that plaintiff could lift or carry up to ten pounds occasionally, could sit, stand and

---

[5] In her brief, plaintiff describes Dr. C. Obi Onyewu as her "treating pain specialist." (D.I. 8 at 8-9) It appears that plaintiff treated with Dr. C. Obi Onyewu at Mid Atlantic beginning in March of 2006. (D.I. 5 at 1215-87; 1197)

7

walk for thirty, twenty and ten minutes respectively without interruption and could frequently reach and push or pull. (*Id.* at 196-98) He also found that plaintiff required a cane when walking distances greater than one half of a block. (*Id.* at 1297).

## D. Hearing Before The ALJ

### 1. Plaintiff's testimony

At her January 3, 2008 hearing, plaintiff testified at length about her physical and mental ailments. (*Id.* at 32-61) But before doing so, the ALJ asked plaintiff about her work history. Plaintiff testified to working as an executive secretary at Dupont for fourteen years after graduating high school and then as a secretary at the Rawlings Environmental Company. (*Id.* at 34) Thereafter, she went to massage school and attempted to open her own massage business; this was difficult in light of the 1999 motor vehicle accident. (*Id.* at 38-39) Her last job was at Super Fresh in 2004; plaintiff testified that she stopped working there because of severe back, neck and TMJ pain. (*Id.* at 40-41) Plaintiff testified that she has not worked since 2004 and does not anticipate working in the future due to her health problems and resultant pain. (*Id.* at 42)

When asked what her biggest health-related concern was, plaintiff acknowledged it was her bipolar disorder. (*Id.* at 42-43) She testified to having a variety of bipolar-related symptoms, including: crying spells, depression, suicidal thoughts, difficulty concentrating and remembering, mood swings, racing thoughts, paranoid thoughts, hearing and seeing things that are not there and panic attacks. (*Id.* at 44-48). While plaintiff admitted that medications and treatment with Dr. Weisberg

8

help, she still feels that she has gotten worse over the years. (*Id.* at 48)

When asked about physical ailments, plaintiff explained that she has severe daily pain in her neck and back that often radiates into her extremities. (*Id.* at 49-52) The pain with medication is around a six or seven on a ten point scale, but would be a ten without medication. (*Id.*) Plaintiff also testified that she has had several procedures on her back, including injections and surgery. While she testified that her surgery helped initially, the pain returned shortly thereafter. (*Id.* at 52) Plaintiff also complained about having carpal tunnel syndrome in her wrists. (*Id.*) She further noted that she was on oxygen and inhalers because of breathing difficulties. (*Id.* at 57)

When asked about her daily activities, plaintiff acknowledged that she could do things like button a shirt and hold a knife and fork. (*Id.* at 53) She also noted that she would let her dogs outside and could drive short distances. (*Id.* at 59-60) She, however, explained that she does not do much in the way of cooking, cleaning or laundry and often times does not shower or dress in the mornings. (*Id.* at 58-61) She also said that she cannot walk for more than five or six minutes, does not normally go up or down stairs and needs a cane to stand for long periods of time. (*Id.* at 55-56)

### 2. **Dr. Weisberg's testimony**

Plaintiff's treating psychiatrist, Dr. Weisberg, testified on plaintiff's behalf. Initially, when answering question's posed by plaintiff's attorney, Dr. Weisberg testified in manner consistent with the mental health questionnaires he filled out. He noted that her illness is "extremely variable" which makes her life "very chaotic." (*Id.* at 67-68) He explained that she has little ability to stay focused, maintain concentration, be punctual

or maintain socially appropriate behaviors. (Id. at 67-73) When asked about her ability to work, Dr. Weisberg stated that plaintiff could not complete a normal work week without interruptions from psychological symptoms and would have extreme difficulty handling normal work-related stress. (Id. at 70-72) When specifically asked if plaintiff could do a simple job on a regular basis, Dr. Weisberg responded in the negative. (Id. at 77-78) When asked about GAF scores, Dr. Weisberg testified that plaintiff's scores generally ranged from a 52-54, but went on too explain that "[the trouble with GAF scores is they] are highly subjective and . . . what might be a 53 to me, might be a 63 to another physician. . . . In my line of thinking, 50 means a patient needs to be hospitalized. . . . Between 51 and 55 means that [a patient has] a severe problem, but [doesn't] need to be in the hospital." (Id. at 65-66)

At plaintiff's attorney's request, Dr. Weisberg also reviewed the criteria used for establishing disability under listing 12.04 (bipolar disorder). (Id. at 73-77) Upon questioning, he indicated that plaintiff met the criteria set forth in 12.04. (Id.)

After hearing the doctor's initial comments on plaintiff's mental health, the ALJ expressed some surprise at the doctor's explanation of plaintiff's mental state. As the ALJ explained, her reading of the doctor's treatment records suggested that plaintiff had major problems in 2001 (that resulted in hospitalization) but appeared to be successfully treating with medication and getting better. (Id. 80-82) The ALJ also emphasized that plaintiff had explained that she stopped working because of physical impairments, not mental ones. (Id.) In response, Dr. Weisberg indicated that his notes from 2003 until 2005 may not be very helpful to an ALJ making a disability

10

determination. He explained that because plaintiff had been treating with him for so long, his notes were brief and nondescript; at some point his notes just became generic remarks and a notation that he was issuing the same medication. (*Id.* at 83) Dr. Weisberg testified that "some people just don't get better," and plaintiff is one of those people that "won't get better [and has not] gotten better." Dr. Weisberg also stated that: "I think I have gotten to the point where I just have probably stopped trying to get [plaintiff] functional . . . my goal is more or less to just hope she can function on a day to day basis. . . . I have not addressed [the issue of returning to work] specifically because . . . from what I see in my office, I don't think she has the emotional stability to go back to work." (*Id.* at 87) As defendant notes, Dr. Weisberg "testified essentially that plaintiff is disabled due to her mental complaints." (D.I. 11 at 9)

### 3. VE's testimony

The VE was asked several hypothetical questions. The first hypothetical, asked by the ALJ, was as follows:

Now, if we consider a hypothetical person who's about the [plaintiff's] stated age at on-set, that'd be 43 years. This person has a high school education, the work history you've just talked about. There are certain underlying impairments on the ability to do work related activity. In this particular hypothetical, if you can, I'd like to have jobs, several at light, several at sedentary, non-exertionally all the posturals are occasional, but never climbing a ladder, rope or scaffold, avoid concentrated exposure to temperature extremes and hazards, and additionally, non-exertionally limited to simple, un-skilled work, work that would not be at a production pace. . . . Any simply un-skilled work that a person could do that would fit within the parameters of the hypothetical if you can, several at light and several at sedentary.

(D.I. 5 at 90-91) In response, the VE explained that this hypothetical person could find work at the sedentary level as a food and beverage clerk, an addressor, and document

11

preparer and could find light work as a recreation aid, garment sorter or ticketer. (*Id.* at 91-92) The ALJ was then asked, by plaintiff's attorney, to review the Mental Impairment Questionnaires filled out by Dr. Weisberg in 2006 and 2007 and state whether or not plaintiff would be capable of doing any work in the national economy based upon Dr. Weisberg's conclusions. The VE responded in the negative. (*Id.* at 92-93) After reviewing the Residual Functional Capacity Questionnaires filled out by Drs. Rastogi and Onyewu (August 2007), the VE also stated that plaintiff would be unable to do any work in the national economy. (*Id.* at 94-95)

## E. Regulatory Framework

The Social Security Administration is authorized to pay DIB to persons who are "under a disability." 42 U.S.C. § 423(a)(1)(E). Social Security Administration regulations incorporate a five-step sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). The ALJ first considers whether the claimant is currently engaged in substantial gainful activity.[6] If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the claimant's impairment meets the criteria of an impairment found in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1

_____

[6] Substantial gainful activity is work activity that is both substantial and gainful. 20 C.F.R. § 404.1572. Work is substantial when it involves doing "significant physical or mental activities." *Id.* Work is gainful when done for pay or profit. *Id.*

(1999). If the claimant's impairment or combination of impairments meets or equals an impairment set forth in the listing of impairments, the claimant is disabled. If the impairment does not meet the criteria for a listed impairment, then the ALJ must first determine the claimant's residual functional capacity ("RFC") before moving on to the fourth and fifth steps of the evaluation process. RFC is defined as the most physical and mental work activity an individual can perform despite limitations resulting from his impairments. 20 C.F.R. § 404.1545. At step four, the ALJ assesses whether, despite the existence of the severe impairment, the claimant has the RFC to perform his past work. Assuming he can, he is not disabled. If, however, the ALJ determines that the claimant cannot perform his past work, then, at step five, the ALJ must determine whether there is other work in the national economy that the claimant can perform. If the claimant can perform other work, he is not disabled; if he cannot perform other work, he will be found disabled.

## F. The ALJ's Decision

The ALJ ultimately concluded that plaintiff could perform other work in the national economy and, therefore, was not disabled. The ALJ made the following enumerated findings:

1. The claimant met the insured status requirements of the Social Security Act on December 31, 2005.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 15, 2004 through her date last insured of December 31, 2005 (20 CFR 404.1520(b) and 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: lumbar and cervical degenerative disk disease, bipolar disorder, and obesity (20 CFR 404.1520(c)).

13

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she should only occasionally climb ramp/stairs, balance, stoop, kneel, crouch and drawl, and never climb a ladder, rope or scaffold. She should avoid concentrated exposure to temperature extremes, vibration and hazards, and perform only simple, unskilled work not on a production line.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born February 6, 1961 and was 43 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from May 15, 2004, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(g)).

(D.I. 5 at 13-25)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive, if they are supported by substantial evidence. Accordingly, judicial review of

14

the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3rd Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under

15

§ 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3rd Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3rd Cir. 1990).

## IV. DISCUSSION

Plaintiff's summary judgment motion identifies five reasons why plaintiff believes the unfavorable decision is not based on substantial evidence. (D.I. 8 at 1-2) First, plaintiff claims that, at step two of the sequential evaluation process, the ALJ erred by not finding plaintiff's CTS to be a severe impairment. Second, plaintiff argues that the ALJ failed to discuss and weigh two relevant and probative medical opinions issued by Dr. Weisberg, plaintiff's treating psychiatrist. Third, plaintiff contends that the ALJ did not give proper deference to the opinions of plaintiff's treating physicians. Fourth, plaintiff argues that she satisfied at least two listings: 12.04 (based upon her bipolar symptoms) and 1.04C (based upon her spinal impairments). Lastly, plaintiff argues that the ALJ improperly relied on an outdated non-examining state agency opinion. Each of these arguments is addressed below.

16

## A. Step Two Severity Finding: Was Plaintiff's CTS A Severe Impairment?

In her decision, the ALJ notes that "Dr. Falco performed an EMG on January 7, 2005 suggestive of bilateral median neuropathy at the wrists, however, no treatment records for this malady could be found [sic] file through the date last insured." (D.I. 5 at 16) The ALJ went on to say that "the first treatment note [for this malady] was a right wrist injection during December 2006, a year after the date last insured." (*Id.*) Based upon these findings, the ALJ concluded that plaintiff's CTS was not severe. (*Id.*) Plaintiff argues this finding was reversible error because step two "is only a de minimis standard" and plaintiff "has a longstanding history of CTS." (D.I. 8 at 17)

In *McCrea v. Commissioner of Social Security*, 370 F.3d 357 (3rd Cir. 2004), the Third Circuit explained the burden placed upon a claimant during the second step of the five step sequential evaluation process:

> The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, at *3; *see also Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."). Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. *Newell*, 347 F.3d at 546-47. In short, "[t]he step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Id.* at 546.

*Id.* at 360; *see also, Holcomb v. Astrue,* Civ. No. 07-863, 2008 WL 3539987, at *5 (W.D. Pa. Aug. 13, 2008) ("The second step is generally viewed as a **de minimis** screening device to dispose of groundless claims. To surmount this hurdle, a claimant need only demonstrate that he or she suffers from something more than a 'slight

17

abnormality' . . . which has no more than a minimal effect on his or her ability to work. In this context, the word 'severe' should not be construed in accordance with its typical meaning. The purpose of the second step . . . is to dispose of claims in which a claimant fails to make a reasonable threshold showing that his or her impairment is one which could conceivably keep him or her from working.") (citations and quotations omitted).

Based upon the above standard, which directs an ALJ to err in favor of the claimant, plaintiff is correct in arguing that the ALJ's severity finding was in error. Plaintiff was diagnosed with carpal tunnel syndrome in January of 2005, approximately one year before her DLI. Treatment records from the relevant period show consistent complaints of wrist, hand and finger pain and numbness. (D.I. 5 at 940, 951, 953, 962, 965, 996) In February of 2005 there was also some contemplation or discussion of using wrist splints to help plaintiff with this type of pain. (*Id.* at 962) Furthermore, contrary to defendant's assertion that plaintiff received no treatment for CTS-related symptoms, the court notes that Mid Atlantic doctors prescribed plaintiff with a variety of pain medications to help her manage her various complaints of pain. On remand, plaintiff's CTS should be considered a severe impairment.

### B. Step Three: Did Plaintiff Meet The Criteria For Any Listed Impairments?

Plaintiff contends that her bipolar and spinal disorders satisfy the criteria set forth in listings 12.04 (bipolar) and 1.04C (spinal). With specific respect to the ALJ's 1.04C analysis, plaintiff also notes that the ALJ makes plainly inaccurate statements and fails to analyze the medical evidence in the manner required by the Third Circuit.

### 1. Listing 12.04: bipolar disorder

Under listing 12.04, a claimant must have an affective disorder that meets the requirements set forth in sections A and B or section C. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04. Under section A, a claimant must have at least four of the nine depressive symptoms listed in section A1, three of the eight maniac symptoms listed in section A2, or bipolar syndrome "with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" (A3). *Id.* The depressive symptoms under A1 are: 1) anhedonia or pervasive loss of interest in almost all activities; 2) appetite disturbance with change in weight; 3) sleep disturbance; 4) psychomotor agitation or retardation; 5) decreased energy; 6) feelings of guilt or worthlessness; 7) difficulty concentrating or thinking; 8) thoughts of suicide; and 9) hallucinations, delusions, or paranoid thinking. *Id.* The maniac symptoms under A2 include: 1) hyperactivity; 2) pressure of speech; 3) flight of ideas; 4) inflated self-esteem; 5) decreased need for sleep; 6) easy distractability; 7) involvement in activities that have a high probability of painful consequences which are not recognized; and 8) hallucinations, delusions or paranoid thinking. *Id.*

Under section B, a claimant must have at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation; each of extended duration. *Id.* A marked restriction is something more than a moderate restriction but something less than a

severe restriction. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.00C.3. Episodes of

decompensation are "exacerbations or temporary increases in symptoms or signs

accompanied by a loss of adaptive functioning, as manifested by difficulties in

performing activities of daily living, maintaining social relationships, or maintaining

concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, Listing

12.00C.4. Such episodes "may be demonstrated by an exacerbation in symptoms or

signs that would ordinarily require increased treatment," and can be "inferred from

medical records showing significant alteration in medication; or documentation of the

need for a more structured psychological support system (e.g., hospitalizations[)]." *Id.*

Repeated episodes of decompensation of extended duration means three episodes in a

year that last for at least two weeks. *Id.*

> Under section C, a claimant must have a:
>
> Medically documented history of a chronic affective disorder of at least 2
> years' duration that has caused more than a minimal limitation of ability to do
> basic work activities, with symptoms or signs currently attenuated by
> medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended
> > duration;[7] or
> >
> > 2. A residual disease process that has resulted in such marginal
> > adjustment that even a minimal increase in mental demands or
> > change in the environment would be predicted to cause the
> > individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside a
> > highly supportive living arrangement, with an indication of
> > continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04C.

For a claimant to show that his impairment matches a listing, "[the impairment]

---

[7] Plaintiff only argues that C1 criteria are met. (D.I. 8 at 12; 13)

must meet **all** of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Williams v. Sullivan,* 970 F.2d 1178, 1186 (3rd Cir.1992) (quoting *Sullivan v. Zebley,* 493 U.S. 521 (1990)).

In her step three analysis, the ALJ looked to sections B and C and concluded that neither criteria were fully established. (D.I. 5 at 17-18). With respect to section B, the ALJ concluded that plaintiff had only mild restrictions in activities of daily living. (*Id.* at 17) The ALJ noted that she maintained a marriage, had a daughter, ran errands, and could do basic cooking activities. (*Id.*) The ALJ concluded that plaintiff had only moderate difficulties in social functioning; while she has had a difficult marital relationship, does not socialize with her neighbors and attends no social functions or clubs, she can "get along with her immediate family" and has "two friends that she keeps in touch with." (*Id.*) With respect to episodes of decompensation, the ALJ noted that plaintiff was hospitalized on two occasions in 2001 but provided no other episodes that were out of the ordinary. (*Id.*) In a rather conclusory fashion, the ALJ also explains that plaintiff has moderate difficulties with respect to concentration, persistence and pace. (*Id.*) With respect to section C, the ALJ acknowledges that plaintiff has a medically documented history of a chronic affective disorder of at least two years' duration, but the ALJ did not find that the criteria set forth in sections C1-3 had been satisfied based upon the evidence. (*Id.* at 18) With specific respect to section C1 - the only section under which plaintiff argues - the ALJ noted that plaintiff has only had two episodes of decompensation and both occurred in 2001. (*Id.* at 17-18) Based upon the foregoing, the court finds that the ALJ's decision to deny benefits at step three was

21

based on substantial evidence. In making this determination, the court is particularly
mindful of the deferential standard afforded to ALJs and the fact that it cannot re-weigh
the evidence.[8]

While plaintiff argues that Dr. Weisberg specifically testified to plaintiff meeting

the 12.04 listing, the court finds this argument unavailing. First, during the course of his

testimony, it is unclear whether the doctor is referring to the relevant time period.

Second, and most importantly, the court notes that a decision on whether a plaintiff

meets a listing is not a medical decision properly made by a treating physician; it is a

determination reserved for the defendant. Social Security Regulation ("SSR") 96-5p at

*1-2.

### 2. Listing 1.04C: spinal disorder

Listing 1.04C is as follows:

1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal
arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
arthritis, vertebral fracture), resulting in compromise of a nerve root (including
the cauda equina) or the spinal cord. With:

. . .

C.  Lumbar spinal stenosis resulting in pseudoclaudication,
established by findings on appropriate medically acceptable imaging,
manifested by chronic nonradicular pain and weakness, and resulting
in inability to ambulate effectively, as defined in 1.00B2b.[9]

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.04C. "Pseudoclaudication refers to painful

cramps in the buttocks, legs and feet while walking or standing, caused by spinal,

---

[8] See supra, pg. 15.

[9] Subparts A and B to this regulation, providing alternate forms of evidence of
spinal disorder, are not asserted to apply.

neurological or orthopedic disorders, including spinal stenosis." *Talmage v. Astrue*, Civ.

No. 09-1065, 2010 WL 680461, at *12 (W.D. Pa. 2010) (citing www.mayoclinic.com); 20

C.F.R. pt. 404, subpt. P, app. 1, Listing 1.00K. Inability to ambulate effectively "means

an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very

seriously with the individual's ability to independently initiate, sustain, or complete

activities. Ineffective ambulation is defined generally as having insufficient lower

extremity functioning . . . to permit independent ambulation without the use of a hand-

held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R.

pt. 404, subpt. P, app. 1, Listing 1.00B2.b. To ambulate effectively, on the other hand,

an individual must "be capable of sustaining a reasonable walking pace over a sufficient

distance to be able to carry out activities of daily living." *Id.* "[E]xamples of ineffective

ambulation include, but are not limited to, the inability to walk without the use of a

walker, two crutches or two canes, the inability to walk a block at a reasonable pace on

rough or uneven surfaces, the inability to use standard public transportation, the

inability to carry out routine ambulatory activities, such as shopping and banking, and

the inability to climb a few steps at a reasonable pace with the use of a single hand

rail." *Id.*

At step three of her decision, the ALJ makes the following observations

regarding plaintiff's spinal impairments:

> The claimant's representative does not so contend that any listing has been
> met or equaled . . . The undersigned has evaluated the claimant's spinal
> impairments and related symptomology under the relevant musculoskeletal
> listings found at section 1.00. However, the objective data does not reflect
> the claimant's impairments are accompanied by the degree of defects as
> required by any relevant listing found under this section. Although the

claimant has complained of persistent and severe lumbar and cervical pain, and has consistently sought treatment for same, there is no evidence of . . . spinal stenosis through the date last insured. Furthermore, the claimant has the ability to ambulate effectively and unassisted.

(D.I. 5 at 16-17)

As plaintiff points out, her attorney did specifically state that he believed a spinal disorder listing had been met. (*Id.* at 31-32) The ALJ was also wrong with respect to the record not reflecting evidence of spinal stenosis. (D.I. 8 at 14; D.I. 5 at 516; 526) Moreover, the record is replete with references to plaintiff having difficulty ambulating. For example, plaintiff testified to difficulty walking distances and an inability to go up or down stairs. There is also evidence in the record that, during the relevant period, plaintiff called an ambulance due to her inability to stand.

From the state of the record, it appears that the ALJ did not believe that plaintiff was contending that she met a spinal impairment listing and, thus, provided a summary conclusion on the issue. This is not sufficient. The Third Circuit specifically requires that an ALJ explicitly weigh all relevant, probative and available evidence and provide some explanation for the rejection of probative evidence that would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir.1994) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3rd Cir. 1979) and *Brewster v. Heckler*, 786 F.2d 581, 584 (3rd Cir. 1986)). Conclusory statements are beyond meaningful judicial review. *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 119 (3rd Cir. 2000). An ALJ's decision must be accompanied by a clear and satisfactory explanation of the basis on which it rests in order for this court to properly decide whether the ALJ's decision is based upon substantial evidence. *Cotter v. Harris*, 642 F.2d 700, 704-05 (3rd Cir.

1981). The case will be remanded for a more comprehensive evaluation and explanation of her step three decision relating to plaintiff's spinal disorder.

## C. RFC Determination: Were Dr. Weisberg's 2006 and 2007 Mental Impairment Questionnaires Properly Considered?

After noting that an ALJ must consider and weigh all probative evidence, plaintiff argues that the ALJ failed to mention, let alone weigh, Dr. Weisberg's July 14, 2006 and August 21, 2007 Mental Impairment Questionnaires in her decision. Plaintiff correctly notes that an ALJ is not only required to weigh all relevant, probative and available evidence, but also must provide some explanation for a rejection of probative evidence that would suggest a contrary disposition. *Adorno*, 40 F.3d at 48. As the Third Circuit stated in *Dobrowolsky v. Califano*, 606 F.2d 403, 406-07 (3rd Cir. 1979), "[t]his Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." Put differently, "unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Gober v. Matthews*, 574 F.2d 772, 776 (3rd Cir. 1978) (citation and quotations omitted).

Defendant, in response, notes that Dr. Weisberg testified at the hearing and discussed with the ALJ, in depth, his treatment of and treatment notes for plaintiff. Defendant argues that because the ALJ "fully discussed Dr. Weisberg's testimony and treatment notes in [her] decision . . . [a] separate discussion of Dr. Weisberg's [two]

25

written assessments . . . would be unnecessary and redundant." (D.I. 11 at 14). The court agrees with defendant.

## D. RFC Determination: Did the ALJ Give Proper Deference To Plaintiff's Treating Physicians?

Plaintiff argues that the ALJ did not accord appropriate deference to her treating physicians; specifically, plaintiff asserts that the ALJ did not appropriately weigh the opinions of Dr. Onyewu (a treating pain specialist) and Dr. Rastagoi (plaintiff's treating neurosurgeon). (D.I. 8 at 7-11) Both these doctors, in 2007 Residual Functional Capacity Assessments, opined that plaintiff could not do sedentary work on a regular basis due to her severe cervical and lumbar spinal problems. (D.I. 5 at 1137-38; 1197-98) Plaintiff contends that the ALJ should have found her incapable of sedentary work and, thus, disabled, based upon these assessments. (D.I. 8 at 7-11)

Plaintiff correctly points out that deference is provided to treating physicians. In fact, a treating source's medical opinion will be given controlling weight if an ALJ finds: 1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; and 2) the opinion is not inconsistent with the other substantial evidence in the record.[10] SSR 96-2p at *2. In many cases, even if a treating source's medical opinion does not meet the test for controlling weight, it will nevertheless be entitled to great weight and should be adopted by an ALJ. *Id.* at *4. In order to determine what weight to accord a non-controlling treating physician's opinion, an ALJ is required to weigh the evidence in light of several factors. *Id.* These factors include:

---

[10] Plaintiff does not argue that either opinion should have been accorded controlling weight. (D.I. 8 at 7-11)

1) the examining relationship - more weight is given to the opinion of a source that has examined a plaintiff as compared to a source that has not; 2) the length, nature and extent of the treatment relationship - more weight is given to the opinion of treating sources since these professionals are most able to provide a detailed and longitudinal picture of a plaintiff's medical history; 3) the supportability of the opinion - more weight is given the opinions that are well explained and supported with clinical or diagnostic findings; 4) the consistency of the opinion - more weight is given to opinions that are more consistent with the record as a whole; 5) specialization - opinions of specialists are given more weight; and 6) other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d).

In her opinion, the ALJ acknowledged the above-described standard for evaluating the opinions of treating physicians. (D.I. 5 at 22-23) She explained that she assigned little weight to Dr. Rastagoi's 2007 assessment - that plaintiff could not perform sedentary work on a regular basis - because his treatment notes contradict such an assertion. (*Id.* at 23) Specifically, his treatment notes suggest that surgery was not necessary and her pain could be managed conservatively with medication. Moreover, the ALJ notes that Dr. Rastagoi's assessment appears to be based, at least in part, on the inaccurate assumption that plaintiff tried, and failed, at several attempts to return to work. (*Id.*) With respect to Dr. Onyewu's 2007 assessment, the ALJ accorded it little weight based upon the fact that it "failed to explain when such limitation was in effect[11] and did not refer to plaintiff's 2006 surgery." (*Id.*) The ALJ went on to

---

[11] Contrary to plaintiff's claim that the ALJ deemed the assessment "totally irrelevant" (D.I. 8 at 10), the decision states that the "assessment was not totally

note that she put great weight on Dr. Carter's RFC assessment because he "performed a detail[ed] analysis" of plaintiff's spinal treatment records during the relevant period. (*Id.*) After performing that detailed analysis, Dr. Carter concluded that plaintiff could, during the relevant period, lift twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight hour day, push or pull without limitation and only occasionally climb, balance, stoop, crouch, kneel or crawl. In her RFC assessment, the ALJ also emphasized that, during the relevant period, plaintiff's spinal problems were treated conservatively (with medication and injections) and are consistent with Dr. Carter's opinions. (*Id.* at 20-23) The court also notes that plaintiff began treating with Dr. Rastagoi on Dec 13, 2005 (less than one month before her DLI) and began treating with Dr. Onyewu in March of 2006 (over a year after her DLI).

Based upon the foregoing, the court finds that the ALJ afforded sufficient weight to the opinions of Drs. Rastagoi and Onyewu. While Dr. Carter was a non-treating physician, the ALJ set forth a reasonable explanation for the weight she accorded Dr. Carter's opinion, as compared with the opinions rendered by Drs. Rastagoi and Onyewu. In making this determination, the court is particularly mindful of the deferential standard afforded to ALJs.[12] Reading the record as a whole, it is apparent that the ALJ was tasked with reviewing a particularly large amount of medical evidence, most of which is dated outside of the relevant period, and numerous conflicting medical opinions, most of which were written well after plaintiff's DLI, and was then required to

---

relevant, given the limitation of the date last insured." (D.I. 5 at 23)

[12] *See supra*, pg 15.

28

make a determination about plaintiff's abilities during a very small time frame. The court finds that the ALJ's decision to accord little weight to the 2007 assessments was based upon substantial evidence.

## E. RFC Determination: Did the ALJ Improperly Rely On An Outdated Non-Examining State Agency Opinion?

Plaintiff argues that the ALJ's reliance on Dr. Carter's RFC assessment was "plain legal error" because the assessment was made before "important evidence was added to the record." (D.I. 8 at 18-19) The court finds this argument unavailing. While plaintiff states that 281 pages were added to the record after Dr. Carter's review was completed, plaintiff does not direct this court to the "important" evidence that was not considered. Furthermore, Dr. Carter's review included plaintiff's medical history up through December 13, 2005 (which is 19 days prior to her DLI).

## V. CONCLUSION

For the reasons discussed above, the court remands the case for further proceedings consistent with this memorandum opinion. Plaintiff's motion for summary judgment, therefore, is granted and defendant's motion for summary judgment is denied. An appropriate order shall issue.